Filed 5/9/13  L.H. v. Super. Ct. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| L.H.,<br><br>      Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF<br>LOS ANGELES COUNTY,<br><br>      Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT<br>OF CHILDREN AND FAMILY SERVICES,<br><br>      Real Party in Interest. | B245600<br><br>(Los Angeles County<br>Super. Ct. No. CK76327) |

ORIGINAL PROCEEDINGS in mandate.  Terry T. Truong, Juvenile Court Referee.  Petition denied.

Christian D. Jackson for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Real Party in Interest.

—————————————

INTRODUCTION

Lakesha H., prior caretaker, appeals from the order of the juvenile court removing siblings G. (age 4 years) and Genesis (age 26 months) from her custody (Welf. & Inst. Code, § 366.26, subd. (n))[1] and denying her modification petition to have the children returned to her care (§ 388). We conclude the evidence supports the court's finding that removal of the children was in their best interest and return would not be in their best interest. Accordingly, we deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

We are familiar with this dependency and so we derive the background facts from our earlier opinion: G. was six months old in February 2009 when the Department of Children and Family Services (the Department) detained her. Her biological mother's female companion told the Department that she signed G.' birth certificate as the "father" with the intention of becoming G.' " ' "legal father." ' "[2] The juvenile court sustained a petition (§ 300) naming the mother and a subsequent petition (§ 342) naming the female companion. The court terminated reunification services for both women and set a permanent plan hearing (§ 366.26). The earlier appeals arose from the efforts of an alleged father to be declared a presumed father of G. (Case Nos. B234918 & B236794).

1. *The children's placement with appellant and their removal from her care*

G. was initially placed in the care of her maternal great-grandmother. When that caregiver died in October 2010, the Department placed G. in Riverside California with her godmother Lakesha. Lakesha is a single mother of two elementary-school-aged children.

Two months later, G.' mother gave birth to Genesis, who was declared a dependent of the court and eventually placed with his sister in Lakesha's care. The court

---

[1]   All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

[2]   Neither G.' mother nor the companion is a party to this appeal.

2

terminated parental rights over G. in October 2011 and designated Lakesha as the prospective adoptive parent.

In Lakesha's care, G. stole, threw tantrums, fought with and bit other children, had trouble sleeping, and stared for long periods of time. She qualified for Regional Center Services and for a special level of care as she was deemed a medically fragile child. Genesis also had medical issues. In May 2011, the juvenile court ordered that G. be assessed for neurological and psychological testing. Despite G.' behavior, she was identified as adoptable.

Lakesha requested play therapy for G., financial assistance to pay for G.' swimming lessons, reimbursement for childcare, and for expenses incurred to modify Lakesha's house for the adoption home study. Lakesha was also unhappy with G.' school and filed complaints there. She felt the administration was retaliating against her.

Lakesha first requested that G. be removed from her home in August 2011 because of a concern that the child's behavior could put Lakesha's family and employment in jeopardy. Lakesha transported G. to Los Angeles from Riverside for visits, which was physically difficult, expensive, interfered with the child's attendance at Head Start, and disruptive to Lakesha's own children. Also, despite referrals, Lakesha could not afford therapy for the child. The matter was resolved when the Department agreed to provide Lakesha with a higher reimbursement rate for her care of G. and assistance in arranging appropriate therapy. Lakesha agreed to adopt G. The juvenile court ordered the Department to provide Lakesha with respite care.

Lakesha's second request for G.' removal occurred six months later in February 2012. Lakesha was bedridden after surgery in early 2012. G. became clingy and jealous when Lakesha paid attention to Genesis, and so she hit her brother. Lakesha reported that G.' behavior was " 'too much for her to handle alone' " and Lakesha's mother would not help. Lakesha wanted to adopt Genesis, but not G. because G.' behavior was worsening and Lakesha believed the Department had not provided the child with adequate services. Lakesha later claimed she gave notice to remove the child to get the Department's attention because the social workers had not provided support services.

Lakesha made her third removal request in March 2012. This time she requested that both children be removed from her care on an emergency basis. She gave the Department written notice two days in advance that she would bring the children into the Department's office, and requested that no one try to change her mind. Lakesha wrote "I have done the best I can do for them and have realized they need and deserve more than what I can give. I have to accept that it is in their best interest to stay together and I can't hold on to Genesis to replace my daughter. . . . [T]here is no way I can handle another 7 days. . . . I am not interested in respite or any reunification services."

2. *Placement with the S.s*

The Department placed the children in the prospective adoptive home of Josh and Joseph S. The children quickly did "wonderfully." They "adapted remarkably well" and appeared to be "happy and thriving." Despite warnings about G.' significant behavioral problems, the S.s reported having only seen what they termed a "normally precocious three year old girl, who naturally and understandably tests boundaries (none related to aggression.)" The S.s found G. to be "a happy, well-balanced, spirited little girl, whose behavior [was] representative of a normal 3-year-old child." Genesis, who came to the S.s unable to walk, began walking in a few short days and within a month was nearly able to run. G. showed no symptoms of the asthma and allergic rhinitis she had been diagnosed with while in Riverside. Although G. had been considered for Regional Center services in Lakesha's care in Riverside, her doctor in Los Angeles characterized the child as " 'amazing,' " as the S.s had her tested and found she was " 'very bright' " and had " 'no health issues whatsoever.' " Despite severe behavioral issues that jeopardized her educational programs in Riverside, in July 2012 G.' doctor noted no developmental concerns. Although G. was at times overactive and defiant, her behaviors were common in foster children and were not pathological. The physician was "very impressed" with the S.s. The Department reported that the children were happy and secure in their environment and doing well. The S.s were providing a calm home and firm, consistent, and nurturing parenting. The S.s had established a "cohesive family unit

4

that is loving, supportive, and stable." The children both referred to the S.s as "daddy" and "papa." (Bold omitted.)

Meanwhile, after the children were placed with the S.s, Lakesha began taking them to the hospital during her visits with them to report injuries and illnesses that proved non-existent. Lakesha was told not to conduct body checks on the children, as they caused the children distress and anxiety. She refused to comply.

A referral was made in May 2012 against the S.s alleging emotional abuse and neglect. The Department investigated and concluded the allegations were unfounded as the children were in excellent health and were doing well. There was no sign of G. being aggressive toward her brother. The S.s were very loving and caring toward the children who were comfortable in the S.s' presence. The investigating social worker found that the children were "*extremely well taken care of.*" (Italics added.)

Lakesha attempted to obtain a restraining order against the S.s, but it was dismissed. She claimed the S.s told G. that Lakesha was just her foster mother and punished the child for referring to her as mommy. In the social worker's view, Lakesha was constantly searching for complaints to make about the children's care.

3. *Lakesha's motions to have the children returned to her custody*

Lakesha soon regretted her decision to have G. and Genesis removed and filed two section 388 petitions for modification requesting the children's return. She claimed that the removal had not been completely voluntary as she had received little help or support from the Department. Lakesha also filed a request to be designated the prospective adoptive parent for Genesis, and objections to the removal of both children (§ 366.26, subd. (n)(3)).

The Department expressed concern that as Lakesha had requested the children's removal before, she would likely request it again. Although Lakesha demonstrated affection for the children, the hurried manner in which she dropped them off at the Department's office indicated her inability to permanently commit to the children and some disregard for their best interest, the Department wrote. The Department was also troubled by what appeared to be Lakesha's negative and exaggerated portrayals of the

children's behavior, development, and medical condition, given they did not demonstrate these behavioral or medical problems in the S.s care.

Lakesha admitted to the juvenile court that she had a poor relationship with her prior social worker and no relationship with the current worker because she made several complaints to the Board of Supervisors about the Department's handling of the case.

4. *The psychological evaluation*

The juvenile court appointed Dr. Michael Dishon as an expert under Evidence Code section 730 to evaluate (1) the children's mental health needs, (2) each caregivers' ability to follow through with services, and (3) the kind of relationship and level of attachment the children had with Lakesha.

Dr. Dishon submitted an 80-page evaluation in which he concluded that both Lakesha and Josh S., the children's primary caretaker, had certain difficulties, but were capable of following through with services as they were both intelligent and disposed to help the children. Although Dr. Dishon was concerned by Lakesha's claims she had been unsuccessful in obtaining services from the Department, he viewed her as better equipped to deal with stress than Josh S., based on the psychological testing. Dr. Dishon identified developmental delays in the children and found that *stability would be very important to the children as they had already experienced numerous changes in caretakers and attachment figures*. Yet, Dr. Dishon expressed doubt about the quality of stability Lakesha could offer the children. Lakesha and Josh S. shared numerous psychological traits which indicate neither is well suited toward offering a secure attachment to the children. Although Dr. Dishon did not make a clear-cut recommendation about placement, he cautiously concluded that G. might be receiving something from the S.s that was lacking during her stay with Lakesha, given the child has been relatively free of behavioral problems since her placement with the S.s. Dr. Dishon opined that Josh S. offered a preferred style of parenting that is more conducive to the development of a secure attachment, whereas Lakesha offered a style more likely to create an anxious attachment.

5. *The juvenile court's ruling*

6

At the hearing on the removal petition, Lakesha's motions, and to review the permanent plan for Genesis, the juvenile court found that the Department met its burden under section 366.26, subdivision (n)(3) and the removal, done on an emergency basis, was proper given Lakesha's multiple requests. The court denied Lakesha's section 388 petition to have the children returned to her care because the change in order would not be in the children's best interest, in part because Lakesha did not get along with the Department and in part because the social worker failed to provide certain services. The juvenile court found that it was in the children's best interest to remain with the S.s because they were doing "fine" in that household and "[i]f I were to return to [Lakesha], I don't know if they would also be doing fine." The court terminated parental rights over Genesis and designated the S.s as the children's prospective adoptive parents. Lakesha appealed.

CONTENTIONS

Lakesha contends the juvenile court erred under section 366.26, subdivision (n) in approving the children's removal and under section 388 in denying her petition seeking their return to her care.

DISCUSSION

1. *The record supports the juvenile court's finding that the Department did not abuse its discretion in removing the children as it was in the children's best interest to be removed and placed with the S.s (§ 366.26, subd. (n)).*

"Once a dependent child is freed for adoption, the [Department] to which the child is referred for adoption is responsible for the child's custody and supervision. The [Department] is entitled to the exclusive care and control of the child at all times until a petition for adoption is granted. [Citations.]" (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.) The Department has discretion to terminate an interim or adoptive placement at any time before the petition for adoption is granted. (*Ibid.*)

However, the Department's discretion concerning interim and adoptive placement "is not unfettered." (*In re Shirley K.*, *supra*, 140 Cal.App.4th at p. 72.) The juvenile court retains jurisdiction over the child, among other things, to ensure that adoption is

7

completed as expeditiously as possible and to ascertain the appropriateness of the placement. (*Ibid.*) Pursuant to section 366.26, subdivision (n), the court is also empowered to review the Department's decision to remove a child from a prospective adoptive parent. (§ 366.26, subd. (n)(3).)

Accordingly, section 366.26, subdivision (n) provides in relevant part that, at the hearing to determine whether the child shall be removed from the custody of a prospective adoptive parent, "the court shall determine whether the caretaker has met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1), and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, *and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest.*" (§ 366.26, subd. (n)(3)(B), italics added.)

It is undisputed that Lakesha was originally designated as the prospective adoptive parent for G. (§ 366.26, subd. (n)(1)) and that she has affection for the children and has done her best in trying circumstances. However, the record supports the juvenile court's conclusion that it was in the children's best interest to be removed from Lakesha and placed with the S.s. Lakesha herself requested G. be removed from her home, not once but three times. The first two times, the Department managed to discourage Lakesha. The third time, however, Lakesha requested both children be removed, that the removal be on an emergency basis, and that no one dissuade her. Each time she requested removal, Lakesha claimed the Department was not providing her with the services and support she needed. Yet, the Department frequently, although not always, provided increased services and arranged for increased funding for Lakesha. Often the reason for Lakesha's difficulties was her own schedule or behavior, or the competing demands of her own children. Furthermore, Lakesha admitted she did not get along with her social worker. She also had difficulties with school authorities, the S.s, and subjected the children to unnerving body checks and hospital visits to report nonexistent injuries and illnesses after they were removed from her care. Dr. Dishon opined that stability was

8

very important for the children.  The Department was concerned that Lakesha was likely to request removal again.  Lakesha's pattern of requesting removal whenever the children become difficult supports the court's finding that in Lakesha's care, the children's stability is undermined with the result removal from Lakesha was in the children's best interest.

2. *The record supports the juvenile court's finding that it was not in the children's best interest to return them to Lakesha's care*.

Section 388 allows a parent or guardian to petition the court for a hearing to modify or set aside any previous order on the grounds of change of circumstance or new evidence, such that the proposed change would be in the children's best interests.

In ruling on a section 388 petition, the juvenile court's task is to determine whether the petitioner demonstrated by a preponderance of the evidence "that [(1)] there is a change of circumstances or new evidence, *and* [(2)] the proposed modification is in the minor's best interests.  [Citations.]" (*In re S.M*. (2004) 118 Cal.App.4th 1108, 1119, italics added; citing *In re Jasmon O*. (1994) 8 Cal.4th 398, 415.)  That is, "[i]t is not enough . . . to show *just* a genuine change of circumstances under the statute.  The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.  [Citation.]" (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529.)  A petition under section 388 is addressed to the juvenile court's sound discretion and on appeal, we will disturb the decision only on a clear abuse of that discretion.  (*In re Jasmon O.*, at p. 415.)

Here, Lakesha failed to demonstrate the second prong of section 388, namely that returning the children to her care would be in their best interests.  She requested removal because she was overwhelmed by the children's behavioral and developmental needs and a lack of services.  She blamed the problems she had in providing the children with services on the Department, or at least her difficulty in getting along with her social worker, the school, and the Regional Center.  By contrast, the children displayed none of the behaviors that concerned Lakesha once they were placed with the S.s.  Indeed, the children's behavior improved markedly in the S.s' care where they were thriving

9

remarkably well. In the S.s' care, the children have a "cohesive family unit that is loving, supportive, and stable," and where they are not subjected to disturbing and unnecessary body checks and hospital visits. (Bold omitted.) Although Dr. Dishon did not identify personality traits in Lakesha that were overly worrisome, and while Josh S. exhibited some traits similar to Lakesha's, Dr. Dishon slightly favored placement with the S.s. over placement with Lakesha based on Josh S.'s preferred parenting style. Therefore, the record supports the juvenile court's conclusion that it would not be in the children's best interest to return them to Lakesha's care. The court did not abuse its discretion in denying Lakesha's section 388 petition for modification.

DISPOSITION

The petition for extraordinary writ is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.